Argued and submitted February 11, 2020, affirmed May 19, petition for review denied August 26, 2021 (368 Or 513)

Jeffrey A. LYONS,
*Plaintiff-Respondent,*

*v.*

Sean BEEMAN,
individually and doing business as
Genesis Pharms,
*Defendant-Appellant.*

Lane County Circuit Court
16CV40678; A167532

494 P3d 358

Defendant leased property from plaintiff to grow marijuana. The parties ended their business relationship in 2016 after a number of disputes about defendant's proposed business ventures on the property. Plaintiff filed this lawsuit against defendant for declaratory judgment, unpaid rent and harvest-related payments, damage to the leased premises, intentional infliction of emotional distress, and conversion. A jury awarded plaintiff $9,500 in unpaid rent and $3,500 for damage to the premises, and it found that the parties had an enforceable contract requiring defendant to pay plaintiff $30,000 from defendant's 2015 marijuana harvest. It found in favor of defendant on all other claims. On appeal, defendant raises five assignments of error, arguing, among other points, that the trial court erred by denying his motion for directed verdict as to plaintiff's claims (1) that the parties had an enforceable contract requiring payment of $30,000 by defendant; (2) for unpaid rent and property damage; and (3) for damages to the premises. *Held*: The trial court did not err. The Court of Appeals reviews motions for directed verdict for "any evidence to support the verdict." In light of that standard of review, the court concluded that plaintiff presented sufficient evidence from which a jury could find for plaintiff on each of the claims at issue.

Affirmed.

Suzanne B. Chanti, Judge. (Judgment entered March 19, 2018, and Supplemental Judgment entered July 3, 2018)

Debra E. Velure, Judge. (Supplemental Judgment entered September 5, 2018)

Brian Michaels argued the cause and filed the opening brief for appellant. Also on the reply brief was Marianne Dugan.

James R. Dole argued the cause for respondent. Also on the brief was Watkinson Laird Rubenstein, P.C.

Before DeVore, Presiding Judge, and DeHoog, Judge, and Mooney, Judge.

MOONEY, J.

Affirmed.

**MOONEY, J.**

Defendant operated a marijuana farm on property he leased from plaintiff. Plaintiff filed a lawsuit against defendant for declaratory judgment, unpaid rent and harvest-related payments, damage to the leased premises, intentional infliction of emotional distress, and conversion. A jury awarded plaintiff $9,500 in unpaid rent and $3,500 for damage to the premises, and it found that the parties had an enforceable contract requiring defendant to pay plaintiff $30,000 from the 2015 harvest. It found in favor of defendant on all other claims. The trial court awarded plaintiff some, but not all, of his requested attorney fees. This appeal followed. As explained below, we affirm.

The original lease between the parties (the 2015 lease) permitted defendant to grow medical marijuana on the leased property. Defendant hoped to become a licensed recreational marijuana producer and to expand his farming operation in 2016 when Oregon's new marijuana law would take effect.[1] To that end, the parties included growing recreational marijuana as an allowed use of the property when they entered into a new lease for 2016.

After entering into the 2016 lease, defendant applied for an Oregon Liquor Control Commission (OLCC) recreational marijuana producer license as expected. A number of issues arose in that process and defendant asked for plaintiff's assistance with some of those, including, for example, obtaining a Land Use Compatibility Statement (LUCS) from Lane County. He requested plaintiff's consent to modify the property by, among other things, installing security fencing and an upgraded electrical system. The parties had numerous communications about the expansion of the marijuana farm, licensing issues, and the parties' obligations to each other well into 2016.

Ultimately, the parties were not able to resolve their differences and plaintiff filed this action. The case was tried to a jury and, as described above, plaintiff won some but

_____

[1] Oregon voters decriminalized the production, sale, and adult use of marijuana for recreational purposes under state law when they approved Ballot Measure 91 in 2014. The Oregon Liquor Control Commission began accepting applications for marijuana production licenses in January 2016.

not all of his claims. Defendant appeals from the judgment awarding plaintiff damages based upon the jury's verdict as well as from the supplemental judgments awarding plaintiff his attorney fees.

Defendant raises five assignments of error. In his first assignment, he contends that the trial court erred in denying his motion for directed verdict as to plaintiff's claim for a declaration that the parties had an enforceable contract requiring defendant to pay plaintiff $30,000 from the 2015 harvest (declaratory relief). In his second assignment, defendant contends that the court erred in denying his motion for directed verdict as to plaintiff's contract claims for unpaid rent. In his third assignment, defendant contends that the court erred in denying his motion for directed verdict as to plaintiff's contract claim for damages caused by the excavation of a utility trench. Defendant's fourth assignment of error challenges the court's award of attorney fees to plaintiff, and his fifth assignment of error is directed to the denial of a requested jury instruction. We reject the fourth and fifth assignments of error without discussion.

We reject defendant's third assignment of error because there was evidence from which the jury could reasonably have concluded that defendant breached the lease when he excavated a utility trench causing the need for repairs to the driveway. On this assignment, defendant relies upon the lack of evidence that the trench had been excavated in an "unworkmanlike manner." But the court had granted plaintiff's motion to amend the complaint to remove the words "unworkmanlike manner" and defendant does not assign error to that ruling. Therefore, testimony or other evidence that the trench was excavated in an "unworkmanlike manner" was not specifically required.

We take up assignments one and two, below, and conclude that there was evidence from which a jury could have found that the parties had an enforceable contract requiring defendant to pay plaintiff $30,000 from the 2015 harvest and that defendant owed plaintiff unpaid rent.

We review the denial of a motion for directed verdict for "any evidence to support the verdict" in favor of the nonmoving party. *Woodbury v. CH2M Hill, Inc.*, 335 Or 154,

159, 61 P3d 918 (2003). Here, plaintiff was the nonmoving party. We, thus, view the evidence in the light most favorable to plaintiff, accepting his testimony as true and, if the evidence supports more than one conclusion, we leave it for the jury to decide. *Kelley v. Washington County*, 303 Or App 20, 21-22, 463 P3d 36 (2020). We will not disturb the jury's verdict unless we can affirmatively say that there is no evidence from which the jury could have found the facts necessary to establish the claim or claims on which plaintiff prevailed. *Schmidt v. Noonkester*, 287 Or App 48, 53, 401 P3d 266 (2017). We state the pertinent facts in line with that standard.

The original lease was entered into on January 8, 2015, between plaintiff and defendant, Sean Beeman, regarding a five-acre piece of farmland in west Eugene. The lease term was for one year, the monthly rent was $3,250, and growing medical marijuana on the property was expressly allowed. Defendant produced approximately 100 marijuana plants on the leased property in 2015, which, at the time, was the maximum number permitted under the law.

Defendant approached plaintiff about expanding farm operations to include growing recreational use marijuana. Plaintiff approved. Defendant submitted his application for an OLCC recreational marijuana producer license in January 2016, under the business name "Genesis Pharms." While the license application process was underway, the parties entered into a new one-year lease agreement with rent still set at $3,250 per month. The lessee was changed from defendant, individually, to defendant's company, Genesis Pharms. Paragraph 30 was revised to read as follows:

"30. Marijuana. Tenant  _X_  may  ___  may not (indicate which) grow medical and/or recreational marijuana on the premises. If allowed, tenant must obtain landlord's prior written consent before installing any equipment or otherwise modifying the premises, which consent may be withheld at landlord's discretion. Tenant shall be solely responsible for any and all damage to the premises resulting from growing or using marijuana, including but not limited to damage related to equipment, moisture or smoke. Tenant shall fully comply with the Smoking Policy disclosed herein

and must strictly comply with any applicable state laws governing marijuana."

Paragraph 40 was also modified with the following handwritten language: "No construction, modification, or permit application without owner approval."

The parties communicated as needed about the OLCC application process during the spring of 2016. In April, plaintiff met with defendant and defendant's agent, O'Neal, at the leased property where they discussed the improvements required by OLCC, defendant's intent to increase marijuana production, increasing the rent, an outstanding debt related to the 2015 harvest, adding a payment for the 2016 harvest calculated as a percentage of production, and defendant's desire to have a multi-year lease in place. The parties characterize those discussions differently, but, given our standard of review, we note that plaintiff testified that he was surprised by the magnitude of defendant's planned increase in marijuana production, that defendant suggested a monthly rent increase of $1,000 to at least partially address that projected increase and that plaintiff agreed to that rent increase, and that the parties discussed a payment related to the 2015 harvest that was currently due as well as a possible production-based payment for the 2016 harvest. Plaintiff testified that, in exchange for the anticipated increase in monthly rent and the additional harvest-related payments, he agreed to "do whatever was necessary" to get defendant through the OLCC licensing process, including providing his approval for property modifications and assisting with the various zoning, land use, and water rights issues that arose as defendant worked to obtain the required LUCS.

There were additional communications in early May. In particular, plaintiff sent a text message to O'Neal on May 3, 2016, stating that, "from [his] standpoint," plaintiff had been waiting for months on the payment from the 2015 harvest and that he needed "to get this settled and an agreement reached." And, on May 26, 2016, O'Neal sent plaintiff an email that, among other things, stated:

"We discussed two projects that need your approval, the electrical upgrade and the enclose fencing. * * *

"* * * * *

"Lastly we discussed some financial matters. You gave me permission to get a detailed accounting for the work done by William Sherlock. You asked that I develop a plan for addressing 3 financial concerns; *bonus for last season*, *raising of monthly rent*, and long term plan for a bonus based on harvests. I will start on this right away and update you as soon as I have new information."

(Emphasis added.)

The rent payment on June 1, 2016, included a $1,000 increase and that increase was included in each monthly rental payment thereafter until November 2016 when rental payments stopped altogether. And, although defendant argued that the increase was intended as an "incentive to get a multi-year lease" rather than an actual agreed-upon rent increase, our standard of review requires us to presume the truth of plaintiff's testimony, which was that the $1,000 was the rent increase defendant had proposed at the in-person April meeting.

And then, on June 17, 2016, O'Neal sent an email to plaintiff on behalf of defendant that included this paragraph:

"I am happy to tell you that I have a proposal for the farm on Hileman. Genesis Pharms proposes that the additional $1000 a month be permanent, that the outstanding lawyer bill be paid in full upon agreement to this proposal, and that you would receive 5% of gross sales by the 15th of the month following the sales month. In exchange for these terms, Genesis Pharms wants the lease extended until Dec. 31st of 2017 with an additional 2 year option."

Notably absent from that email was any mention of the 2015 payment. Plaintiff and O'Neal exchanged text messages and, on June 21, 2016, plaintiff emailed O'Neal expressing frustration with the process but indicating that he would nevertheless continue to negotiate with Genesis Pharms "to arrive at an enforceable agreement covering the promised payment for 2015" and for an additional payment for 2016 based on sales. "Upon receipt in full," he would be willing to place defendant in "first position" for a 2017 lease. As plaintiff explained in his testimony, he did not want to move on to discussing a new lease for 2017 until they had resolved the matters concerning the payment for the 2015 harvest and the production-based payment for the 2016 harvest.

O'Neal emailed plaintiff on June 30, 2016, requesting clarification of several points and, as pertinent here, asked, "What is your expectation for a payment for 2015 and when would that be due?" Plaintiff responded the next day:

"Point number one: I consider 2015 due and payable now. This payment was first promised to me in December 2015 and has been the subject of numerous conversations since that point. I'd like to get it wrapped up."

The two exchanged additional emails that further defined that 2015 payment obligation. On July 11, 2016, O'Neal proposed, among other things:

"Payment for 2015:   The extra $1000 sent each month was meant to address this issue but Genesis is willing to add an additional 10k payable December 1, 2016."

On July 15, 2016, O'Neal sent an email to plaintiff that included, as pertinent here:

"Basics of the agreement:

"Language in the current lease is brought forward. * * *

"* * * * *

"2015 payment:   total of 30k, current $1000 a month (total $9000) plus 21k payout on Dec. 1, 2016."

That email prompted the following exchange of text messages between plaintiff and O'Neal:

Plaintiff:   "Do you want to call me with the correction to the rent/profit sharing issue? Or do I consider this your offer? Which I reject."

O'Neal:   "Sorry I totally forgot about the continuation of the 4250 in rent for 2017 but let me call and talk through this. I will have some time this afternoon."

Plaintiff:   "This is not about 2017. This is about GP attempting to modify the agreement on the rent for the remainder of 2016. No portion of the current 4250.00 is to be applied to monies owed on 2015."

O'Neal:   "OK. . . I hear you. . . I will be in touch."

O'Neal:   "Had a quick chat with [defendant] and if the 9k is the only stumbling block then the payout Dec 1 would be 30k . . . Call you when I am free to talk."

Plaintiff: "Thank you."

And then, on July 22, 2016, O'Neal sent this email to plaintiff:

> "Starting with the existing lease as a base with the following changes:
>
> "In 'Tenancy' section, lease terms will change to '1 year commencing Feb. 1 2017 and ending Jan. 31 2018 at a rental cost of $4250 per month * * *'
>
> "* * * * *
>
> "1.  One-time payout of 30K due Dec. 1st, 2016, from Genesis Pharms to landlord. This one-time payment is to settle all past debts between the two parties.
>
> "2.  Genesis Pharm agrees to payout 5% of gross proceeds of the sale of the flower. * * *
>
> "3.  * * * Genesis Pharms will automatically be given the option to extend the lease for another year at the same terms as the current lease agreement."4. At the signing of this document, landlord will consider the tenant in 'good standing' regarding adherence to the terms of the lease. * * *
>
> "Michael O'Neal
>
> "Genesis Pharms."

On August 1, 2016, plaintiff sent O'Neal an email responding to the July 22, 2016, email, stating:

> "I accept in principal [*sic*]. Please prepare a document which we can sign. I will plan a trip to sign immediately."

Plaintiff also sent a text message and an email shortly after that in which he added that he was unable to agree to the third point of the July 22 proposal concerning automatic annual options to extend the lease.

On September 20, 2016, plaintiff sent this text message to O'Neal:

> "At this time, after repeated attempts, I am requiring a written proposal from Genesis Pharms pertaining to your offer (which I previously accepted in principle) be submitted to me no later than September 30 2016 5pm PDT. I will

be submitting this proposal to my attorney at that time for review. Basic parameters:

"1)    $30,000 payment from 2015 due on or before 12/1/16

"2)    Payment to Jeffrey Lyons from Genesis Pharms of a percentage to be determined gross sales of 2016 crop grown at 221 Hileman lane, Eugene, Oregon

"These two items are the starting point for resolution of the offer made by Sean Beeman in 2015 and not yet fulfilled."

On September 30, 2016, O'Neal sent another email to plaintiff, which proposed that the $30,000 payment obligation be broken down into three $10,000 payments to be paid annually on December 31 in 2016, 2017, and 2018. Plaintiff responded 30 minutes later with a one-word email: "No." He then sent O'Neal a text message, stating:

"I'm sorry but your proposed offer fails to meet previously promised payments and is therefore not acceptable. Thank you for getting back to me."

That discussion ended. Plaintiff terminated the lease and defendant vacated the property in early January 2017. This lawsuit followed, culminating in a jury trial and the jury's verdict as already described.

We turn now to defendant's first two assignments of error, in which he argues that there was no evidence of an enforceable contract requiring him to pay plaintiff $30,000 related to the 2015 harvest or to pay an increased rental amount. He first notes that neither the 2015 obligation nor the $1,000 rent increase were included in the 2016 lease, and he specifically argues that the parol evidence rule bars evidence of those matters as terms of that lease. He also argues that there is no evidence of consideration or acceptance to support either the $30,000 obligation or the rent increase. The parties agree that the 2016 lease was in place at all times relevant to this case.

The parol evidence rule, ORS 41.740,[2]

_____

[2] ORS 41.740 provides:

"When the terms of an agreement have been reduced to writing by the parties, it is to be considered as containing all those terms, and therefore there can be, between the parties and their representatives or successors in interest, no evidence of the terms of the agreement, other than the contents

"provides that a binding, completely integrated, written agreement supersedes or discharges all agreements, written or oral, that were made *before* the completely integrated agreement, to the extent that the prior agreements are within the scope of the completely integrated agreement."

*Abercrombie v. Hayden Corp.*, 320 Or 279, 286, 883 P2d 845 (1994) (citations omitted; emphasis added). The rule's prohibition, then, would be against the admission of evidence that the 2016 lease included terms that do not appear within the four corners of that written lease agreement. However, the parol evidence rule does not apply here because the evidence that defendant seeks to exclude under that rule concerns discussions about a different, preexisting agreement and about modifications to the 2016 lease. Plaintiff does not argue that the $30,000 obligation from 2015 or the $1,000 rent increase were terms of the 2016 lease. The parol evidence rule does not, therefore, exclude them.

Establishing a contract modification, like establishing a contract, requires proof of three things: an offer, acceptance of the offer, and an exchange of consideration. *Bennett v. Farmers Ins. Co.*, 332 Or 138, 153-54, 26 P3d 785 (2001); *Marnon v. Vaughan Motor Co., Inc.*, 184 Or 103, 156-59, 194 P2d 992 (1948). In Oregon, we apply an objective theory of contracts. The existence of a contract or contract modification is not determined by the parties' subjective understanding of their communications. *Newton/Boldt v. Newton*, 192 Or App 386, 392, 86 P3d 49, *rev den*, 337 Or 84 (2004), *cert den*, 543 US 1173 (2005). Instead, to determine whether a contract was formed, we "examine the parties' objective manifestations of intent, as evidenced by their communications and acts." *Ken Hood Construction v. Pacific Coast Construction*, 201 Or App 568, 578, 120 P3d 6 (2005), *adh'd to as modified on recons*, 203 Or App 768, 126 P3d 1254, *rev den*, 341 Or 366 (2006). Assent may be inferred from the conduct of the parties. *VTech Communications, Inc. v. Robert Half, Inc.*, 190

---

of the writing, except where a mistake or imperfection of the writing is put in issue by the pleadings or where the validity of the agreement is the fact in dispute. However, this section does not exclude other evidence of the circumstances under which the agreement was made, or to which it relates, as defined in ORS 42.220, or to explain an ambiguity, intrinsic or extrinsic, or to establish illegality or fraud. The term 'agreement' includes deeds and wills as well as contracts between parties."

Or App 81, 86, 77 P3d 1154 (2003), *rev dismissed*, 337 Or 547 (2004). And, importantly, "[q]uestions regarding the intent of the parties are for the factfinder." *Dalton v. Robert Jahn Corp.*, 209 Or App 120, 132, 146 P3d 399 (2006), *rev den*, 342 Or 416 (2007); *see also Bennett*, 332 Or at 148 (concluding that whether a "statement or act" manifests assent or acceptance is a question for the jury).

We begin with the additional $1,000 that defendant added to his rent payment for each of the months of June through October 2016. There was disputed evidence on the question whether those additional payments represented an agreed upon increase in the monthly rent. To be sure, defendant says that he made those payments to induce plaintiff into giving him a multi-year lease. But plaintiff testified that defendant proposed the $1,000 increase at the April meeting when plaintiff expressed surprise about the planned four-fold harvest increase. Additionally, there was evidence that the increase began soon after that meeting, on June 1, and that it was included as part of the rent payment—not as a separate payment—in each subsequent month. That evidence certainly supports the jury's determination that the additional $1,000 was the rent increase discussed and agreed to at the late April meeting. Defendant's conduct in making those additional payments was itself evidence of the agreed increase that he had proposed at that meeting. *See Bennett*, 332 Or at 154 (holding that a party's conduct may constitute evidence of mutual assent).

We next address defendant's argument that plaintiff did not accept defendant's offer of $30,000. As detailed above, the parties were engaged in ongoing discussions that concerned a variety of topics, including matters covered by the existing 2016 lease and matters not covered by the 2016 lease. Both parties ultimately focus on the exchange of the July 22, 2016, email from O'Neal to plaintiff and the responsive August 1, 2016, email from plaintiff to O'Neal. The July 22 email came after O'Neal received clarification from plaintiff that the payment for 2015 was distinct and separate from any future lease agreement and that plaintiff considered it presently due and owing. Given that clarification, O'Neal sent the July 22 email, in which he conveyed an offer

of a "one-time payout of 30k" due December 31, 2016, "to settle all past debts between the two parties." Plaintiff responded with "I accept in principal [*sic*]." Plaintiff requested that the agreement be reduced to writing and he said that he was prepared to sign it. We have held that a party communicating agreement to an offer "in principle," subject to a formalized writing, can constitute acceptance of the offer. *Dalton*, 209 Or App at 134. And where, as here, the acceptance is clear, the fact that the agreement still needed to be reduced to writing does not change the fact that the offer was made and accepted. *See Restatement (Second) of Contracts* § 27 (1981) ("Manifestations of assent that are in themselves sufficient to conclude a contract will not be prevented from so operating by the fact that the parties also manifest an intention to prepare and adopt a written memorial thereof[.]").

It is true that the July 22 email from O'Neal referred to "the existing lease as a base" and that it proposed a number of other terms for a future lease. It is also true that, after accepting the offer in principle, plaintiff sent an email clarifying that he would not agree to open-ended lease extensions. However, the July 22 to August 1 exchange provides evidence to support the jury's conclusion that there was an offer from O'Neal and an acceptance by plaintiff. Plaintiff's follow up communication provides evidence that his acceptance of the offer to pay $30,000 was to the offer as expressed by O'Neal—as a "one-time payment * * * to settle all past debts between the two parties"—an offer to settle an existing debt.

Finally, we turn to defendant's argument that the offer to increase the rent and the offer to pay $30,000 from the 2015 harvest were not supported by valid consideration. Consideration is "'the accrual to one party of some right, interest, profit or benefit or some forbearance, detriment, loss or responsibility given, suffered, or undertaken by the other.'" *McPhail v. Milwaukie Lumber Co.*, 165 Or App 596, 600-01, 999 P2d 1144 (2000) (quoting *Shelley v. Portland Tug & Barge Co.*, 158 Or 377, 387, 76 P2d 477 (1938)). Here, there was evidence that defendant sought and obtained plaintiff's approval to modify the leased property relative to the OLCC licensing process and to defendant's own process

of converting his business to the production of recreational marijuana. The 2016 lease required defendant to obtain plaintiff's prior written approval for such modifications. The lease did not require plaintiff to give his approval. Without that approval, defendant would not have been able to move forward with his plans for producing recreational marijuana on the leased property. The jury, thus, had evidence to conclude that plaintiff's approval of the modifications constituted valid consideration for the $1,000 rent increase. And, while that evidence also supports that there was consideration for the $30,000 obligation, O'Neal's July 22 email offer to pay plaintiff $30,000 to "settle all past debts between the two parties" was evidence of an existing obligation between the parties that required no new showing of consideration. Plaintiff told defendant that he had considered the $30,000 presently due and payable and there was no evidence that defendant disputed that. The evidence, to the contrary, is that defendant negotiated as if he understood that to be the case. The jury, therefore, had evidence that there was an existing $30,000 obligation between the parties from the 2015 harvest. That existing obligation would not have required additional consideration. *Jole v. Bredbenner*, 95 Or App 193, 197, 768 P2d 433 (1989).

There was evidence to support the jury's determination that the parties had enforceable agreements for the rent increase and for the $30,000 obligation from the 2015 harvest. The trial court did not err by denying defendant's motion for a directed verdict on plaintiff's breach of contract claims.

Affirmed.